## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TERESA S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:24-CV-2022-MAB[2] |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Teresa S. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. For the reasons set forth below, the Commissioner's decision is REVERSED and this matter is REMANDED for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

### PROCEDURAL HISTORY

Plaintiff filed an application for SSI on February 24, 2021, alleging disability beginning on that date[3] (Tr. 17, 35-36, 283). Plaintiff's claim was initially denied on May 28, 2021 (Tr. 17, 75) and upon reconsideration on February 16, 2022 (Tr. 17, 83). Plaintiff

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c) (Doc. 9).

[3] Plaintiff's application initially alleged an onset date of January 1, 2012 (Tr. 75, 77). However, that onset date was later amended to match the protective filing date (Tr. 35-36, 283).

requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 106), which occurred by telephone on January 4, 2024 (Tr. 31-56).[4] Following the hearing, ALJ Edward Evans issued an unfavorable decision on March 25, 2024 (Tr. 14-30). Plaintiff timely filed a request for review, but that request was denied by the Appeals Council on June 25, 2024 (Tr. 1-13). Accordingly, the ALJ's decision became the final agency decision and Plaintiff exhausted her administrative remedies (Tr. 1).

Plaintiff filed her Complaint with this Court on August 23, 2024 (Doc. 1). Thereafter, the Commissioner submitted a Transcript of the Administrative Record on October 17, 2024 (Doc. 10). Plaintiff's social security brief was filed on November 15, 2024 (Doc. 12), and the Commissioner's social security brief was filed on February 12, 2025 (Doc. 19). Plaintiff then filed a reply brief on February 26, 2025 (Doc. 20).

## APPLICABLE LEGAL STANDARDS

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).[5]

---

[4] Plaintiff also appeared telephonically at hearings before ALJ Evans on March 3, 2023 (Tr. 57-67), and June 15, 2023 (Tr. 68-74). However, both of those hearings resulted in postponements while Plaintiff obtained representation (Tr. 57-74). Plaintiff subsequently obtained counsel who represented her at the hearing held on January 4, 2024 (Tr. 31-34).

[5] The statutes and regulations pertaining to Disability Insurance Benefits ("DIB") are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical.

To determine whether a claimant is disabled, the ALJ conducts a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). The first step is to determine whether the claimant is presently engaged in substantial gainful activity. *Id.* at § 416.920(a)(4)(i). If the answer is yes, then the claimant is not disabled regardless of their medical condition, age, education, and work experience. *Id.* at § 416.920(a)(4)(i), (b). If the answer is no and the individual is not engaged in substantial gainful activity, the analysis proceeds to the second step. *Id.* at § 416.920(a)(4).

At step two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. If the answer is no, then the claimant is not disabled. *Id.* at § 416.920(c). If the answer is yes, the analysis proceeds to step three. *Id.* at § 416.920(a)(4).

At step three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 416.920(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 416.920(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity ("RFC"). *Id.* at § 416.920(e).

---

Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.

An individual's RFC is his or her ability do work despite the individual's impairments. *Id.* at § 416.945; *see also Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) ("RFC is the maximum that a claimant can still do despite his mental and physical limitations."). "In assessing a claimant's RFC, the ALJ must consider all of the relevant evidence in the record and provide a 'narrative discussion' that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and '[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.'" *Passig v. Colvin*, 224 F. Supp. 3d 672, 680 (S.D. Ill. 2016) (quoting SSR 96-8).

At step four, the ALJ must determine whether the claimant retains the RFC to perform the requirements of their past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(a)(4)(iv), (f). If the answer is no, the analysis proceeds to the final step. *Id.* at § 416.920(a)(4).

At the fifth and final step, the ALJ must consider whether the claimant can make an adjustment to perform any other work considering the claimant's RFC, age, education, and work experience. *Id.* at § 416.920(a)(4)(v). If the claimant can make an adjustment to other work, then the claimant is not disabled. *Id.* at § 416.920(g). Conversely, if the claimant cannot, then the claimant is disabled. *Id.*

Notably, the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). This Court's task is not to determine whether Plaintiff was, in fact, disabled at the relevant time, but instead to determine whether the ALJ's

findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Id.* (internal citations omitted).

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is presented in mostly chronological order and directed to the points and factual allegations raised by Plaintiff. Specifically, because Plaintiff challenges the ALJ's failure to obtain medical expert review of new medical evidence (*see* Doc. 12), the Court's summary of the record focuses upon evidence pertaining to those issues.

I.    *Relevant Medical Records*:

Plaintiff's medical records demonstrate that Plaintiff had an extensive medical history prior to her February 2021 application date, which included necrotizing pneumonia with bronchial fistulas that healed, a chronic cough, right lung partial pneumonectomy, a prolonged coma, an IVC filter placement, the removal of three right ribs, and the placement of wires in her chest (*see* Tr. 378, 555, 581, 591). In February 2021, a positron emission tomography ("PET") scan of Plaintiff's skull to mid-thigh found multiple lung nodules which were persistent, but had deceased in size and appeared to be consistent with infection or inflammation (Tr. 458-459). Plaintiff presented to the emergency room one week later, on February 16, 2021, reporting blood in her cough (Tr. 378-383). No clear abnormality was identified to account for Plaintiff's report of coughing blood, but examinations revealed mild disc disease of Plaintiff's musculoskeletal and scattered areas of linear scarring in Plaintiff's right lung (Tr. 392-393). X-rays of Plaintiff's spine in May 2021 revealed multilevel degenerative changes ranging from mild to moderate and the presence of an IVC filter (Tr. 413-416).

On November 9, 2021, Dr. Adrian Feinerman conducted a consultative examination of Plaintiff (Tr. 437-445). At that time, Dr. Feinerman noted that Plaintiff was diagnosed with COPD and degenerative disc disease, and had MRSA Pneumonia in 2011 (Tr. 442). Regarding Plaintiff's pulmonary system, Dr. Feinerman's physical examination found that Plaintiff's lungs were clear to auscultation and percussion, with no wheezes, rales or rhonchi (Tr. 441). Dr. Feinerman's examination of Plaintiff's musculoskeletal system found Plaintiff had no limitations to motion, no abnormalities of any extremity,

strong grip strength, no anatomic deformity of the spine, and no difficulties performing actions such as tandem walking, standing on toes or heels, squatting, or rising from a chair (Tr. 441). Dr. Feinerman concluded that Plaintiff was able to sit, stand, walk, hear, and speak normally (Tr. 442). Additionally, she could lift, carry, and handle objects without difficulty (Tr. 442).

On December 1, 2021, Plaintiff had a computed tomography scan of her chest (Tr. 555). That scan showed multiple bilateral lower lobe nodules of decreased size, mild centrilobular and/or pan-lobular emphysema, and pulmonary arterial hypertension (Tr. 555). On February 11, 2022, a plethysmograph test found that Plaintiff had a moderate obstructive lung defect and a moderate decrease in diffusing capacity (Tr. 449-454). A related pulmonary function test report from that date made similar findings and noted a loss of 140mL in FEV1 (forced expiratory volume in one second) over the past one and a half years (Tr. 541).

On April 29, 2022, Plaintiff presented to the emergency room with complaints of shortness of breath and chest pain (Tr. 515, 532). Plaintiff was admitted to the hospital on that date and discharged on May 3, 2022 (Tr. 529). An examination revealed mild respiratory distress including moderate rales heard in the right posterior lower lobe and mild, scattered rhonchi (Tr. 533). A computed tomography scan also found new, mild infiltrate in the left lower lobe consistent with pneumonia, postoperative changes of median sternotomy and right partial pneumonectomy, and emphysematous changes that were greater in the upper lungs (Tr. 515, 533).

Plaintiff had a follow-up office visit with a cardiologist on September 12, 2022 (Tr. 472). A physical exam documented that Plaintiff appeared frail but otherwise found normal results (Tr. 474). The cardiologist's impressions included dyspnea on exertion, chest pain, anxiety, and venous insufficiency (Tr. 474). Following that appointment, Plaintiff participated in a one-week heart study that required her to wear a heart monitor (Tr. 481-487, *see also* Tr. 476). That study found Plaintiff had Sinus Tachycardia with 2 paroxysmal Supraventricular Tachycardia events, rare Ventricular ectopics, and rare Supraventricular ectopics (Tr. 481). A follow-up cardiology appointment on November 28, 2022, detailed the study results and found that Plaintiff had a new issue of paroxysmal supraventricular tachycardia, improved chest pain, and unchanged issues of tobacco use, dyspnea on exertion, and chronic obstructive pulmonary disease ("COPD") (Tr. 478-479).

Meanwhile, on October 16, 2022, Plaintiff presented to the emergency room with complaints of lower back pain (Tr. 498). An examination revealed moderate lower back pain and a painful range of motion with rotation to the left, but otherwise normal results (Tr. 498). A physical therapy treatment note from December 2, 2022, indicates that Plaintiff presented with chronic back and bilateral pain and paresthesia, tenderness and tightness to palpitation, and increased neural tension (Tr. 581).

Plaintiff visited the emergency room again on March 20, 2023, complaining of a prolonged headache and her hands turning blue when she would wake in the morning (Tr. 563). Plaintiff was diagnosed with peripheral vascular disease, but her results were otherwise within normal ranges (Tr. 563-565). Plaintiff had a pulmonology appointment on March 24, 2023 (Tr. 668). At that time, the nurse practitioner observed that Plaintiff

appeared underweight, chronically ill, and depressed/tearful, but could ambulate without assistance (Tr. 670). Decreased breath sounds were observed, but otherwise her respiratory results were normal (Tr. 670). The nurse practitioner also noted that Plaintiff used supplemental oxygen at night (Tr. 671).

On March 28, 2023, a CT scan of Plaintiff's chest observed nodularity of the right lobe which appeared stable to less prominent than from her previous CT scan, borderline ectasia of the central pulmonary arteries, mild thoracic and advanced lower cervical degenerative disc disease, and a partially visualized IVC filter (Tr. 561). Impressions from those CT scans were: "1. No acute intrathoracic process; 2. Postoperative changes of partial right pneumonectomy and soft tissue flap re-identified, unchanged since multiple previous imaging studies; 3. Emphysema." (Tr. 561). Plaintiff had a follow-up visit with the pulmonology nurse practitioner on April 21, 2023 (Tr. 662-665). The findings from that appointment largely mirrored those from her previous appointment, although at that time the nurse practitioner also prescribed Plaintiff a nebulizer and supplemental oxygen equipment (Tr. 665). Similar observations and assessments were made at another follow-up visit on June 21, 2023 (Tr. 657-660).

On September 13, 2023, Plaintiff had a consultative appointment with Dr. Cohn, an orthopedic surgeon, regarding her neck and lower back pain (Tr. 679). Dr. Cohn recommended physical therapy for Plaintiff's cervical spine and indicated that if physical therapy didn't alleviate Plaintiff's cervical pain, a myelogram of both the cervical and lumbar spine would be the next course of action (Tr. 679). X-rays from that date found mild reversal of the usual cervical lordosis and moderate degenerative disc disease,

which was greatest in the mid cervical spine (Tr. 692). Plaintiff saw Dr. Cohn again on October 25, 2023 (Tr. 693-698). It was noted that Plaintiff had participated in physical therapy in the last 6 months and was continuing with home exercises (Tr. 694). An examination revealed that Plaintiff had 5 out of 5 strength in her bilateral upper and lower extremities (Tr. 695). Myelograms of Plaintiff's cervical and lumbar spine were ordered at that time (Tr. 696) and performed on November 2, 2023 (Tr. 700-704). The myelogram of Plaintiff's cervical spine showed, among other results, a developmental cervical spinal canal stenosis and superimposed multilevel degenerative disc and joint disease, which was worse at C3-C4, C4-C5, C5-C6, and C6-C7 (Tr. 703). The myelogram of Plaintiff's lumbar spine showed a mild multilevel degenerative disc and joint disease of the lumbar spine, which was worse at L4-L5, and non-filling of the nerve roots sleeves at L4-L5, bilaterally (Tr. 704).

Plaintiff had a follow-up appointment with Dr. Cohn on November 14, 2023 (Tr. 713). At that time, Plaintiff described issues related to balance and worsening manual dexterity, which resulted in her dropping things, avoiding clothes with buttons, and avoiding handling hot cookware (Tr. 713). An examination revealed that Plaintiff had 5 out of 5 strength in her bilateral upper extremities, and 4 out of 5 strength with interosseous muscles bilaterally (Tr. 713). Dr. Cohn indicated that "on review of [Plaintiff's] cervical and lumbar CT myelograms[,] her cervical myelogram demonstrates multilevel stenosis more severe at C4-5 C5-6 and C6-7 with mild stenosis C3-4." (Tr. 713). In addition, Plaintiff "has multiple levels of bilateral neuroforaminal stenosis. Her lumbar spine[,] her myelogram demonstrates mainly L4-5 lateral recess stenosis." (Tr. 713). Dr.

Cohn then discussed a plan to first address Plaintiff's cervical spine with surgery, after which they would consider a lumbar laminectomy at L4-5 (Tr. 713).

Plaintiff had a pre-operation appointment on January 30, 2024 (Tr. 717-724). Dr. Cohn then performed the cervical laminectomy and posterior arthrodesis (a C2-T2 fusion) on February 12, 2024 (Tr. 737-739). After several days of monitoring Plaintiff's recovery, she was discharged in good condition on February 15, 2024 (Tr. 741-752). Plaintiff visited Dr. Cohn for a follow-up appointment on February 27, 2024 (Tr. 730-735). Dr. Cohn's notes state:

> 47-year-old female is now 2 weeks out status post C2-T2 fusion with C3-C7 laminectomy. Unfortunately she presents today with signs and symptoms consistent with a mild C5 palsy with 3-4 out of 5 elbow flexion very to 5 supination and 2 out of 5 deltoid function. She also reports radicular symptoms shooting down to her thumb mostly in a C6 distribution. All the symptoms began 3 to 4 days after she was discharged from the hospital. She has had difficulty with pain control as most pain medications give her adverse reactions and she has had significant difficulty sleeping due to her pain. For now recommended 100 mg dose of gabapentin to be taken at night to help her with sleep and her arm pain. Suspect her C5 palsy will slowly improve as well as her radicular pain and suspect this is due to nerve root irritation with inflammation and swelling as her fusion heals. Will plan to see her back in 4 weeks for repeat x-rays and clinical exam. X-rays today did not demonstrate any complication, or change in alignment or positioning of hardware since her hospital x-rays.

(Tr. 734).[6]

---

[6] Although Dr. Cohn's progress note indicated that numerous additional medical examinations and records were forthcoming (Tr. 734), the ALJ's decision was issued shortly after that date, such that Plaintiff's post-surgery follow-up appointment with Dr. Cohn was the last record considered by the ALJ (*see* Tr. 30) (listing Hospital Records from 2023-09-13 to 2024-02-27 as one of the exhibits the ALJ considered in reaching a decision, and noting those records were supplied by Plaintiff's representative after the hearing).

II.    *Disability Determinations and Prior Administrative Medical Findings*[7]

Dr. John Peterson reviewed Plaintiff's application and records at the initial level in May 2021 (Tr. 76-81). Pertinently, at that time, Dr. Peterson wrote that medical records from sources listed in Plaintiff's application had not been compiled because Plaintiff's release form was improperly filled out and Plaintiff had failed to respond to any attempts to contact her to resolve the issue (Tr. 79). Accordingly, Dr. Peterson found Plaintiff was not disabled because a medically determinable impairment had not been established (Tr. 80; *see also* Tr. 82).

In February 2022, Dr. Ranga Reddy, an anesthesiologist, reviewed Plaintiff's application and medical records at the recon level (Tr. 84-90). Dr. Reddy first noted that Plaintiff's claim was denied at the initial level because her medical records, activities of daily living, and work history were not provided (Tr. 85). Thereafter, Dr. Reddy ruled out any mental health issues because no mental health diagnosis or related files were on record and Plaintiff's appearance, behavior, concentration, and ability to relate were found as normal at her consultative examination (Tr. 85).

Dr. Reddy found Plaintiff had the medically determinable impairments of COPD and a disorder of the skeletal spine (Tr. 86). Dr. Reddy opined that Plaintiff's claims regarding her symptoms were partially consistent with the medical and nonmedical evidence (Tr. 86). However, Plaintiff's alleged symptoms were undercut by Plaintiff's

---

[7] The Court only briefly summarizes the two Prior Administrative Medical Findings on record because: (1) the ALJ did not find either to be persuasive and thus, did not rely upon them (*see* Tr. 22-23), and (2) they were prepared upon review of medical records that, even at that time period, were noted to be limited/incomplete (*see* Tr. 79, 86).

examination results from her consultative examination with Dr. Feinerman, which showed normal ambulation and no issues with special maneuvers (Tr. 86-87). Accordingly, Dr. Reddy found Plaintiff had a physical RFC that allowed unlimited pushing and/or pulling in both the upper and lower extremities (TR. 87). Additionally, Plaintiff could both sit and stand/walk for about 6 hours in an 8-hour workday (Tr. 87). Plaintiff could occasionally lift and/or carry 20 pounds, and could frequently lift and/or carry 10 pounds (Tr. 87). Due to Plaintiff's COPD and degenerative changes to her spine, Dr. Reddy imposed the following postural limitations: occasional climbing ramps/stairs, occasional climbing ladders/ropes/scaffolds, unlimited balancing, frequent stooping, unlimited kneeling, unlimited crouching, and frequent crawling (Tr. 88). Dr. Reddy also found Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and irritants due to her history of COPD (Tr. 88).

Ultimately, Plaintiff was determined to be capable of performing light work based upon Dr. Reddy's findings and limitations (Tr. 89). As a result, it was specified that Plaintiff could work as: (1) Room Service Clerk, DOT code 324.577-010; (2) Routing Clerk, DOT code 222.687-022; and (3) Pari-mutuel Ticket Seller, DOT code 211.46 (Tr. 89). Accordingly, Dr. Reddy and Disability Examiner Mindy DeWitt determined that Plaintiff was not disabled (Tr. 89-90).

III.    *Administrative Hearing*:

An administrative hearing was held before ALJ Evans telephonically on January 4, 2024 (Tr. 31-56).[8] Plaintiff was represented by attorney Velma Jones at the hearing, and Vocational Expert Steven Benjamin was also present (Tr. 31-33). Plaintiff testified that she was not currently working and could not recall having worked a full-time job in the last 15 years (Tr. 41). When asked what medical conditions prevented her from working, Plaintiff provided several reasons including breathing issues, low energy, coughing blood, side-effects of her numerous medications, neck and back pain, and an inability to stand for long periods of time (Tr. 41). Plaintiff explained that taking the trash out is a difficult task for her to accomplish, often requiring her to take a break halfway through the yard (Tr. 42). She also expressed difficulties with completing tasks such as laundry, cleaning dishes, and showering due to her arms going numb after five minutes (Tr. 42). Furthermore, Plaintiff stated that she could not vacuum or sweep because it would kick up particles into the air, causing her to cough and choke (Tr. 42).

Plaintiff elaborated on the difficulties she faced due to her breathing issues, noting that she was prescribed several inhalers which make her feel dizzy, nauseous, and irritable (Tr. 43). When asked about using supplemental oxygen, Plaintiff said that she had a prescription for supplemental oxygen to be used when sleeping (Tr. 44). However, Plaintiff reported occasionally using supplemental oxygen during the day when taking naps (Tr. 44).

---

[8] As previously noted in footnote 4, Plaintiff also appeared before ALJ Evans at two other hearings in 2023, but both of those hearings were postponed so Plaintiff could obtain representation.

Plaintiff discussed her then-upcoming laminectomy and fusion surgery which was scheduled for February 12, 2024 (Tr. 45). She stated that her doctor anticipated a 6 to 8 month recovery from that surgery, prior to moving into her next surgery (Tr. 45). When asked about her ability to walk, Plaintiff responded that she can only walk for three to five minutes before her legs go numb and her lower back starts hurting (Tr. 46). She explained that while she does not use a cane and had not been prescribed one, she instead would hold on to walls when walking (Tr. 46). Plaintiff also stated that due to pain, she repositions herself every eight to ten minutes when sitting in a chair (Tr. 46-47).

Plaintiff's attorney then asked about her ability to carry things, to which Plaintiff answered she could barely carry a gallon of milk and was dropping things more frequently of late (Tr. 47). She then expanded upon this answer, noting that she dropped boiling water on one occasion and her neighbor's coffee mug on another occasion (Tr. 47). As a result, Plaintiff tried to avoid picking up objects that weighed more than a gallon of milk (Tr. 47). Plaintiff also expressed her struggles with using buttons and picking things up (Tr. 48). Additionally, Plaintiff said that she no longer drives because her leg or buttocks would go numb while she was driving, or she would need to move and reposition herself (Tr. 48).

Counsel then asked Plaintiff about her mental health problems. Plaintiff explained that "ever since [she] woke up from a coma after 58 days," she faced numerous identity and mental health issues, and was constantly looking for validation (Tr. 48). Finally, Plaintiff's counsel asked about the IVC filter in her body (Tr. 50). Plaintiff said she was in a coma when the filter was implanted, and they still had not determined which doctor

was responsible for the filter's placement (Tr. 50). And although the filter had caused her problems including blood stones, she was told that it was too dangerous to remove it now because it had been in her for such a long period of time (Tr. 50-51). The ALJ then asked Plaintiff about her naps, to which she explained that she typically took two naps per day that were each between one hour and one and a half hours in length (Tr. 51).

The ALJ also directed several questions to the Vocational Expert (Tr. 52). First, the ALJ asked if jobs were available under the following hypothetical:

> The first such hypothetical individual is an individual of the Claimant's age, education, and experience who may perform work at the sedentary exertional level. The individual may occasionally climb ladders, ropes, scaffolds, ramps, and stairs. The individual may occasionally stoop and crawl.
> The individual should avoid concentrated exposure to vibration, to extreme cold temperatures and weather, to humidity, and to pulmonary irritants examples of which include fumes, odors, dusts, gases, and poor ventilation. The individual may shift position between sitting and standing for a few minutes as frequently as every half hour without loss of productivity, end of hypothetical.

(Tr. 52-53). The Vocational Expert answered by providing three sedentary, unskilled jobs which fit the hypothetical, including: (1) masker, DOT code 715.687-086; (2) hand mounter, DOT code 976.684-018; and (3) stuffer, DOT code 731.685-014 (Tr. 53).

The ALJ then posed a second hypothetical which was identical to the first hypothetical, except the individual in the second hypothetical "may frequently reach on the directionally bilaterally." (Tr. 53). The Vocational Expert explained that his answers would not change from the first hypothetical, as under either, the individual need to be able to reach frequently (Tr. 53).

Thereafter, the ALJ asked the Vocational Expert what is the maximum time an individual can be absent and maintain competitive employment (Tr. 53). The Vocational Expert answered, "typically one to two times per month." (Tr. 53). In response to a follow-up question posed by the ALJ about off-task time, the Vocational Expert said an individual can be off task ten percent of the time or less (Tr. 53). The Vocational Expert then explained that breaks customarily occur every two hours, with the first and third breaks being 15 to 20 minutes and the middle break normally being 35 to 40 minutes long (Tr. 53-54). The Vocational Expert also clarified that extra, longer, or non-regimented breaks would all be considered accommodations (Tr. 54).

## THE ALJ'S DECISION

The ALJ followed the five-step analytical framework described above. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since Plaintiff's application date of February 24, 2021 (Tr. 19). At step two, the ALJ found Plaintiff had the severe impairments of "multilevel degenerative disc disease (DDD) with radiculopathy (status-post surgical intervention); chronic obstructive pulmonary disorder (COPD); asthma; and venous insufficiency (20 CFR 416.920(c))." (Tr. 19).

At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (Tr. 19-20). In reaching this conclusion, the ALJ found that Plaintiff's back issues were evaluated under Listings 1.15 and 1.16 but did not meet the criteria of either (Tr. 19-20). Plaintiff's COPD was evaluated under Listing 3.02, but did not meet that Listing's criteria because Plaintiff did not have

FEV values equal to or less than 1.25, nor chronic impairment of gas exchange, nor significantly abnormal arterial blood gas valves (Tr. 20). Plaintiff's asthma also failed to meet Listing 3.03 because she did not have chronic bronchitis and did not have asthma attacks at least once every two months in spite of prescribed treatment and requiring physician intervention (Tr. 20). Lastly, Plaintiff's venous insufficiency did not meet Listing 4.11 because the evidence did not show that Plaintiff had "the condition of a lower extremity with incompetency or obstruction of the deep venous system" and either extensive brawny edema or "superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment." (Tr. 20).

Prior to considering step four, the ALJ analyzed Plaintiff's RFC (Tr. 20-23). The ALJ found as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she may occasionally climb ladders, ropes, scaffolds, ramps, and stairs. The claimant may occasionally stoop and crawl and may frequently reach omnidirectionally bilaterally. She should avoid concentrated exposure to vibration, to extreme cold temperatures and weather, to humidity, and to pulmonary irritants (e.g., fumes, odors, dusts, gases, poor ventilation). The claimant may shift position between sitting and standing for a few minutes as frequently as every half hour without loss of productivity.

(Tr. 20). In reaching this conclusion, the ALJ explained that a sedentary exertional level was warranted based upon "*overlapping symptomologies* that would support a medical need to spend most of the day seated, as well as a need to shift that position every half hour due to pain from osteoarthritic degeneration of the spine, with radiculopathy noted,

*and post-surgical changes, as well as breathing disorders that would limit the claimant further.*" (Tr. 21) (emphasis added). The ALJ indicated "that this, along with the exacerbation of her chronic venous problems, supports limits in posture, reaching, and away from environmental conditions that would trigger her breathing problems or exacerbate her back pain (such as vibration)." (Tr. 21).

After summarizing Plaintiff's testimony of her symptoms and limitations, the ALJ found Plaintiff's medically determinable impairments could be reasonable expected to cause those alleged symptoms (Tr. 21). However, the ALJ found Plaintiff's statements about the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with other medical and non-medical evidence in the record (Tr. 21).

Regarding Plaintiff's complaints of back and neck pain, the ALJ found medical records supported multilevel degenerative changes, but other records noted she had minimal difficulty (Tr. 21). The ALJ emphasized that the latest medical records produced in Exhibit 14F (*see* Tr. 678-755) found Plaintiff had "no difficulty in ambulation, no lifting/activity restrictions, and some improvement in her back pain with physical therapy." (Tr. 21). The ALJ explained that while Plaintiff complained of worsening manual dexterity, examinations showed good grip strength and that she was "doing well after a C2-T2 laminectomy, C3-C7 laminectomy in February 2024." (Tr. 22). "Overall, *surgery addressed her moderate issues*, and limitation to a sedentary exertional level with manipulation limitations as supported by the objective evidence would be appropriate." (Tr. 22) (emphasis added).

Regarding Plaintiff's lung and breathing disorders, the ALJ cited to numerous medical records that showed Plaintiff was still smoking and had good oxygen saturation levels (Tr. 22). The ALJ highlighted the fact that Plaintiff's nighttime desaturations were being treated by oxygen and a 6-minute walking exam did not show issues with saturation (Tr. 22). Thus, the ALJ concluded this demonstrated Plaintiff could perform sedentary work during the daytime (Tr. 22).

The ALJ then discussed the November 2021 consultative examination performed by Dr. Feinerman (Tr. 22). Pertinently, the ALJ reiterated that the examination showed Plaintiff had normal ambulation without an assistive device, had no issues with grip strength, and could dress normally and perform other actions without difficulty such as picking up a coin, picking up and holding a cup, and picking up a pen (Tr. 22). However, the ALJ acknowledged that Dr. Feinerman did not prepare an opinion on Plaintiff's overall functioning (Tr. 22). "The undersigned notes this is a one-time examination, which does establish that the claimant is not debilitated and could maneuver, there is certainly evidence of further limitation longitudinally, which is the basis for the limitations above. The observational examination results here notwithstanding, the limitations in the RFC are justified for the whole of the period, *__including later evidence of some continued degeneration.__*" (Tr. 22) (emphasis added).

Finally, the ALJ concluded his RFC analysis by finding that Dr. Reddy's light exertional limitation and related findings were not persuasive. Specifically, "[g]iven recent surgery, and her history of back and breathing issues predominately, exacerbated by venous problems would support more limitation than this finding would allow. While

her breathing issues are addressed by these limits, her back/neck issues are not, and would give greater limitations." (Tr. 22-23). The ALJ found Dr. Peterson's findings to be similarly unpersuasive (Tr. 23).

At step four, the ALJ found that Plaintiff has no past relevant work (Tr. 23). Finally, at step five, the ALJ relied on the Vocational Expert's testimony to conclude that Plaintiff was not disabled because there were jobs in significant numbers in the national economy that an individual with Plaintiff's RFC could perform such as masker, hand mounter, and stuffer (Tr. 23). The ALJ also found the Vocational Expert's testimony about other jobs to be consistent with the Dictionary of Occupational Titles (Tr. 23).

<u>ISSUES RAISED BY PLAINTIFF</u>

Plaintiff raises the following issue:

1. Did the ALJ commit reversible error at Step 3 by failing to submit new and potentially probative objective medical evidence to medical expert scrutiny? (Doc. 12 at p. 1).

<u>DISCUSSION</u>

Plaintiff argues that new medical evidence from 2023 and early 2024 demonstrated that her conditions had objectively worsened, and therefore, should have been subjected to medical expert review (*Id.* at pp. 10-11). In response, the Commissioner avers that the ALJ fairly considered the new evidence, and the ALJ's RFC determination accounted for Plaintiff's limitations and even imposed restrictions beyond those provided in any medical source in the record (Doc. 19 at pp. 5-7). Additionally, the Commissioner argues that Plaintiff failed to demonstrate that new limitations following Plaintiff's February 2024 surgery were expected to last more than 12 months, such that they had not been

shown to be disabling (*Id.* at pp. 9-10). Ultimately, the Court finds Plaintiff's argument regarding the need for expert review of the new, arguably-ambiguous evidence to be persuasive.

Significantly, a consultative examination and an expert review of Plaintiff's medical records were conducted by Dr. Feinerman in November 2021 (Tr. 437-445) and Dr. Reddy in February 2022, respectively (Tr. 84-90).[9] This means that although numerous medical developments and records were made over the next two years, no expert review of those records or Plaintiff's overall condition occurred to help guide the ALJ's analysis of Plaintiff's condition and capabilities. "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion. But older assessments can still constitute substantial evidence supporting the ALJ's decision where the new tests do not necessarily undermine previous medical conclusions." *Bakke v. Kijakazi*, 62 F.4th 1061, 1066-67 (7th Cir. 2023) (internal quotation marks and citations omitted). *See also Baptist v. Kijakazi*, 74 F.4th 437, 442 (7th Cir. 2023) ("It is well-established that ALJs may not rely on a state agency consultant's assessment if later evidence 'reasonably could have changed' the opinion.").

For instance, in *Smith v. Berryhill*, the district court looked at whether the ALJ impermissibly played doctor by interpreting potentially decisive medical evidence

---

[9] As was previously noted, Dr. Peterson also conducted a disability determination in May 2021 (Tr. 76-81). However, Dr. Peterson did not provide any meaningful findings related to Plaintiff's condition because he lacked access to Plaintiff's medical records.

without medical expert review. 406 F. Supp. 3d 722, 727 (N.D. Ind. 2019). As the district court explained, "more than 200 pages of documents spanning the course of over 2 years were not reviewed by the state agency physicians. ***The sheer volume of documents the agency consultants did not review is worrisome.***" *Id.* (emphasis added). Given the volume of unreviewed documents, the district court found that remand was required because "it is not the province of the ALJ or Commissioner's counsel to determine whether the presence or absence of a medical episode or event along with other matters contained in the unreviewed medical records is medically significant; that job is reserved for the medical expert and other physicians of record." *Id.* at 727-28 (quoting *Charita W. v. Berryhill*, 18-CV-955, 2019 WL 2524096, at \*4 (N.D. Ill. June 18, 2019)).

Here, as in *Smith*, hundreds of new pages of medical records were prepared in the more than two years following Dr. Feinerman's and Dr. Reddy's reviews. Admittedly, it is likely that some of those records did not need to be reviewed by medical experts because they "did not include the kind of 'new diagnosis' that would undermine previous conclusions about [the claimant's] disability status." *Bakke v. Kijakazi*, 62 F.4th 1061, 1067 (7th Cir. 2023). The issue, however, is that many other records contain new medical diagnoses that "reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018).

Take, for example, the new medical evidence surrounding Plaintiff's back surgery in February 2024.[10] That evidence, including Dr. Cohn's notes from February 27, 2024,

---

[10] The Court discusses this example because it was argued at length by the parties and represents a medical development and diagnosis that is clearly significant and ambiguous. Notably, however, numerous other

contained new, seemingly significant medical diagnoses that "reasonably could have changed" Dr. Reddy's and Dr. Feinerman's assessments (*see* Tr. 734). *Id.* Thus, that evidence should have been considered by Dr. Reddy and Dr. Feinerman.

Furthermore, while the parties may debate the actual significance of that new evidence (to which the Court takes no position at this time), there can be no doubt that the ALJ found it to be significant because he explicitly referenced and relied upon that new material when reaching his own RFC determination that imposed limitations beyond those suggested by Dr. Reddy and Dr. Feinerman. For example, when formulating Plaintiff's RFC, the ALJ made it clear that he was accounting for "post-surgical changes … that would limit the claimant further." (Tr. 21). In fact, the ALJ even rejected Dr. Reddy's assessment because, "[g]iven [Plaintiff's] recent surgery, and her history of back and breathing issues predominately, exacerbated by venous problems would support more limitation than this finding would allow." (Tr. 22). Accordingly, the ALJ impermissibly played doctor when interpreting the voluminous, new medical records, by finding some of those records significant enough to warrant additional limitations beyond those suggested by any expert, without having received any expert input when interpreting those medical records and crafting more restrictive limitations based upon them.[11]

---

medical records from after February 2022 also include new, potentially significant medical diagnoses, that were never considered by Dr. Reddy or Dr. Feinerman, such as: (1) Plaintiff's plethysmograph test results (Tr. 449-454); (2) the results of Plaintiff's heart-health study (Tr. 481); (3) Plaintiff's March 2023 CT scans (Tr. 561); and (4) the results from Plaintiff's numerous emergency room visits.

[11] Relatedly, the Commissioner argues that Plaintiff bore the burden of establishing that her post-surgery limitations were a "disabling arm weakness" and not just a temporary setback (*see Id.* at p. 9). *See Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017) ("It was Summers's burden, not the ALJ's, to prove that she

Additionally, the ALJ's references to and interpretation of Plaintiff's most-recent medical records did not provide a logical bridge to support his determinations. As noted above, the ALJ acknowledged Plaintiff's post-surgery limitations at various points in his decision and even attempted to account for those limitations when formulating Plaintiff's RFC (Tr. 21-22). Nevertheless, at other points within the ALJ's RFC analysis, he contradicts those concessions by stating Plaintiff "was doing well after" surgery and "surgery addressed her moderate issues." (Tr. 22). In fact, at one point, the ALJ even states that the latest medical records demonstrate that Plaintiff was "having no difficulty in ambulation, no lifting/activity restrictions, and some improvement in her back pain with

---

was disabled."); *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018) ("Dr. Vora's opinion suggesting that Britt elevate his foot in the short-term does not translate into a long-term need, so the ALJ was entitled to limit it to its proper context."); *Sonji L. v. Kijakazi*, 19 C 4109, 2022 WL 672741, at *4 (N.D. Ill. Mar. 7, 2022) ("It was Plaintiff's burden to show disability, including the nature and severity of any impairment, its duration, and her residual RFC."). Admittedly, on the record before the Court, there is no indication as to whether the mild C5 palsy observed by Dr. Cohn on February 27, 2024, was to be a lasting limitation or a temporary setback (*see* Tr. 734). Dr. Cohn's remark was that he "suspect[s] her C5 palsy will slowly improve as well as her radicular pain," which he "suspect[s] this is due to nerve root irritation with inflammation and swelling as her fusion heals." (Tr. 734).

　　　Here, while the Commissioner's durational arm-weakness argument is not wrong insofar as it relates to finding an impairment, it misses the mark for other reasons. First, it assumes that the only disabling limitation and impact that potentially resulted from Plaintiff's surgery was related to her arm weakness. But, given the nature of Plaintiff's surgery, it seems highly likely that Plaintiff's laminectomy and spine fusion would have an impact on the condition of her back[11] – a condition which the ALJ already determined at step two constituted the severe impairment of multilevel degenerative disc disease with radiculopathy (Tr. 19). Furthermore, regardless of whether Plaintiff's arm weakness would meet durational requirements to constitute its own severe impairment, the ALJ was required to consider the entirety of Plaintiff's ailments when formulating Plaintiff's RFC. *Vogelgesang v. Berryhill*, 1:17-CV-146-TLS, 2018 WL 2197909, at *6 (N.D. Ind. May 14, 2018). ("[W]hether an impairment imposes a significant limitation of function for twelve months is not the question at [the RFC] step; that is the question at step two."); *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) ("As we—and other circuits—have emphasized repeatedly in reviewing denials of disability benefits by the Social Security Administration's administrative law judges, the combined effects of the applicant's impairments must be considered, including impairments that considered one by one are not disabling."); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of Golembiewski's impairments was 'severe,' the ALJ needed to consider the *aggregate* effect of this entire constellation of ailments–including those impairments that in isolation are not severe.").

physical therapy." (Tr. 21). The Court does not see a way to reconcile these apparent contradictions. Therefore, not only did the ALJ impermissibly play doctor by interpreting years of new medical records without expert input, but he also did so in a contradictory and confusing manner which failed to provide a logical bridge from the evidence to his overall conclusion. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) ("[W]e cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome.").

For the reasons discussed above, the Commissioner's final decision denying Plaintiff's application for SSI is REVERSED and REMANDED. As a final note, however, the Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled or that she should be awarded benefits. To the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.[12]

---

[12] Additionally, on remand, if the ALJ again finds that Plaintiff is capable of work, the Court advises the ALJ and Vocational Expert to consider the underlying responsibilities of each job that the Vocational Expert testifies Plaintiff would be capable of performing to ensure they don't run afoul of the ALJ's limitations.

Here, for example, one job the Vocational Expert found Plaintiff could perform within the limitations imposed by the ALJ's RFC determination was a masker, DOT code 715.687-086. As specified in the DOT, a masker: "Brushes lacquer in second track recess of timepiece dial to prevent removal of finish during polishing and brushes lacquer over trylons (numerical markings) of dial to prevent trylons from being plated during dial-plating operation." Pertinently, however, the ALJ's RFC stated the individual "should avoid concentrated exposure … to pulmonary irritants (e.g., fumes, odors, dusts, gases, poor ventilation)." (Tr. 20, 52-53). Given Plaintiff's documented history of lung concerns and the ALJ's limitations in recognition of those issues, this raises obvious concerns as to whether Plaintiff would actually be capable of working a job where her primary duty would be to apply lacquer, a substance which creates fumes, is odorous, and has been noted to be harmful in certain circumstances. *See, e.g., Lacquer Poisoning*, MOUNT SINAI, https://www.mountsinai.org/health-library/poison/lacquer-poisoning ("Lacquer is a clear or colored coating (called a varnish) that is often used to give wooden surfaces a glossy look. … Breathing in the fumes for a long period is also harmful.").

<u>C</u>ONCLUSION

The Commissioner's final decision denying Plaintiff's application for SSI is

**REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration

of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:** December 3, 2025

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**
